Clayeo C. Arnold (SBN 65070)
Kirk J. Wolden (SBN 138902)
kirk@justice4you.com
Clifford C. Carter (SBN 149621)
CLAYEO C. ARNOLD
A Professional Corporation
608 University Avenue
Sacramento, CA  95825
Telephone:  (916) 924-3100
Facsimile:  (916) 924-1829

Ernest Cory (ASB-2279-Y83E)
F. Jerome Tapley (ASB-0583-A56T)
Hirlye R. "Ryan" Lutz, III (ASB-6641-E59L)
CORY WATSON CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue
Birmingham, AL 35205
Telephone: (205) 328-2200
Facsimile: (205) 324-7896

Michael F. Ram (SBN 104805)
mram@ramolson.com
RAM & OLSON LLP
555 Montgomery Street, Suite 820
San Francisco, California  94111
Telephone:  (415) 433-4949
Facsimile:  (415) 433-7311

Attorneys for Plaintiffs and the Class

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(OAKLAND DIVISION)

| | |
|---|---|
| KIRK KEILHOLTZ and KOLLEEN KEILHOTZ for themselves and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LENNOX INDUSTRIES, INC.; LENNOX HEARTH PRODUCTS, INC.; LENNOX INTERNATIONAL, INC., and DOES 1 through 25, inclusive,<br><br>Defendants. | NO.  4:08-CV-00836CW<br><br>**NOTICE OF MOTION; MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:  November 12, 2009<br>Time: 2:00 p.m.<br>Place: Courtroom 2, 4th Floor |

1

**TABLE OF CONTENTS**

2   STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4(a)(3))................................................ 1

3   MEMORANDUM OF POINTS AND AUTHORITIES................................................ 1

4   I.      INTRODUCTION................................................................ 1

5   II.     COMMON OPERATIVE FACTS ................................................ 3

6           A.      The Product ................................................................ 3

7           B.      Lennox's California Operations ........................................ 3

8           C.      The Problem ................................................................ 4

9                   1.      500-Degree Glass Fronts:  Too Hot To Handle ................ 4

10                  2.      Contradictory Industry Standards................................ 4

11                  3.      Lennox's Hazardous Fireplaces are Dangerously Defective, And
                            They Knew It ................................................................ 5

12

13                  4.      Effective Guarding Was The Only Option................................ 6

                    5.      Average Consumers ................................................ 7
14

15                  6.      An Untenable Personal And Social Cost................................ 8

16                  7.      Too Little Too Late ................................................ 8

        III.    ARGUMENT ................................................................ 9
17

18          A.      The Elements of Rule 23(a) Are Satisfied Here.................... 10

19                  1.      The Class is So Numerous that the Individual Joinder of All Class
                            Members Would Be Impracticable................................ 10

20                  2.      There Are Questions of Law and Fact Common to Plaintiffs and
                            Members of the Class. ................................................ 10
21

22                  3.      The Claims of the Representative Plaintiffs are Typical of the
                            Claims of the Class................................................ 11

23                  4.      The Class Representatives and Their Counsel Will Fairly and
                            Adequately Protect the Interests of the Class. .................... 12
24

25          B.      The Rule 23(b)(3) Elements are Satisfied as Common Questions
                    Predominate and Certification Presents the Superior Method for
                    Adjudication. ................................................................ 13
26

27                  1.      California Law Applies to the Class................................ 13

28                          a.      Applying California Law to the Nationwide Class is
                                    Constitutional. ................................................ 13

1

              b.     Governmental Interests Dictate Applying California Law.......... 15

2

                    (1)     No conflict exists among consumer protection laws....... 16

3

                    (2)     No other state has an interest in applying its own

4
                            law. ................................................................................ 17

5

                    (3)     California's interests in deterring unlawful conduct
                            would be most impaired if its laws were not applied. ...... 17

6

      2.     Common Issues of Law and Fact Predominate. ...................................... 18

7

      3.     Class Treatment is Superior to Other Methods of Adjudication. ............ 20

8

CONCLUSION ....................................................................................................... 23

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Bates v. United Parcel Ser.*
   204 F.R.D. 440 (N.D. Cal. 2001) ........................................9

*Blackie v. Barrack*
   524 F.2d 891 (9th Cir. 1975)........................................9, 20

*Church v. Cons. Freightways, Inc.*
   1992 U.S. Dist. LEXIS 18234 (N.D. Cal. 1992)................13, 15, 17

*Clark v. TAP Pharm. Prods. Inc.*
   798 N.E.2d 123 (Ill. App. Ct. 2003)........................................16

*Clothesrigger, Inc. v. GTE Corp.*
   191 Cal. App. 3d 605 (1987)................13, 14, 17

*Cuesta v. Ford Motor Co.*
   209 P. 3d 278 (Okla. 2009) ........................................14

*Daffin v. Ford Motor Co.*
   458 F.3d 549 (6th Cir. 2006)........................................19

*Dal Ponte v. American Mortg. Exp. Corp.*
   2006 U.S. Dist. LEXIS 57675 (D.N.J. 2006)................9, 14, 16, 18

*Dal Ponte v. American Mortg. Exp. Corp.*
   2006 U.S. Dist. LEXIS 57675 (D.N.J. 2006)........................................16

*Eisen v. Carlisle & Jacquelin*
   417 U.S. 156 (1974) ........................................9

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. 1998)................10, 11, 12, 16

*Hanon v. Dataproducts Corp.*
   976 F.2d 497 (9th Cir. 1992)........................................11

*Klaxon Co. v. Stentor Elec. Mfg. Co.*
   313 U.S. 487 (1941) ........................................15

*Martin v. Dahlberg*
   156 F.R.D. 207 (N.D. Cal. 1994)........................................15

*Mooney v. Allianz Life Ins. Co.*
   244 F.R.D. 531 (D. Minn. 2007)........................................14

*Moore v. Hughes Helicopters, Inc.*
   708 F.2d 475 (9th Cir. 1983)........................................9

*Parkinson v. Hyundai Motor America*
   2008 U.S. Dist LEXIS 101098 (C.D. Cal. 2008) ................14, 19

*Phillips Petroleum, Co. v. Shutts*
   472 U.S. 797 (1995) .................................................................................... 13

*S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*
   241 F.R.D. 85 (D. Mass. 2007) ................................................................... 19

*Washington Mutual Bank v. Superior Court*
   24 Cal. 4th 906 (2001) ......................................................................... 16, 17

*Wershba v. Apple Computer, Inc.*
   91 Cal. App. 4th 224 (2001) ................................................................ 14, 16

*Xiufang Situ v. Leavitt*
   240 F.R.D. 551 (N.D. Cal. 2007) .............................................................. 9, 10

*Zeno v. Ford Motor Co.*
   238 F.R.D. 173 (W.D. Pa. 2006) ................................................................ 20

**Statutes**

Cal. Bus. & Prof. Code §17200 .................................................................. 18

Cal. Civ. Code §1770(a) ............................................................................. 18

Civ. Code section 1780 .............................................................................. 19

Civ. Code section 1782 ................................................................................ 8

**Treatises**

1 Newberg on Class Actions
   § 3.10, 274-278 (4th ed. 2002) ("Rule 23(a)(2)") ..................................... 10

Wright, Miller & Kane, Federal Practice and Procedure
   §1779 (2d ed. 1986)................................................................................... 21

Case No. 4:08-cv-00836 CW -- MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

1  TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

2  PLEASE TAKE NOTICE that on November 12, 2009, at 2:00 p.m. a.m. in Courtroom 2,

3  4th Floor, of this Court, Plaintiffs will move for class certification. This motion will be made on

4  the grounds that questions of law and fact common to the class predominate over any questions

5  affecting individual members.

6  The motion will be based on this Notice of Motion, the following Memorandum of Points

7  & Authorities; the accompanying Declaration of Kirk Keilholtz; Declaration of Kolleen

8  Keilholtz; Declaration of Andrea Shaw; Declaration of Carol Pollack-Nelson; Declaration of

9  Alan Robert Dimick, M.D., Declaration of Deirdre Wooldridge; Declaration of Kirk J. Wolden;

10  Declaration of F. Jerome Tapley; Declaration of Michael F. Ram; [Proposed] Order Granting

11  Plaintiffs' Motion for Class Certification; and Plaintiffs' Proposed Trial Plan in Support of

12  Motion for Class Certification; the records and file in this action, and on such other matters as

13  may be presented before or at the hearing of the motion.

14  **STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4(A)(3))**

15  Whether Plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) by

16  showing that: (1) the Class is so numerous that joinder of all class members is impracticable; (2)

17  there are common issues of fact or law; (3) Plaintiffs' claims are typical of those class members;

18  (4) Plaintiffs and their counsel will adequately represent the interests of the Class; (5) common

19  issues of law and fact predominate over individual issues and (6) class treatment is superior to

20  other methods of adjudication.

21

22  **MEMORANDUM OF POINTS AND AUTHORITIES**

23  **I.  INTRODUCTION**

24  This case, involving sale of dangerous unguarded 500 degree[1] glass front fireplaces in

25  violation of the California Consumers Legal Remedies Act, the California Unfair Competition

26  Law and the common law of unjust enrichment, is the quintessential type of claim for which the

27  _____

28  [1] All temperature references are in degrees Fahrenheit.

1    class action mechanism was created.  As noted by one court:

2           [T]his is a consumer class action, and in our large and impersonal society, class
            actions are often the last barricade of consumer protection. The consumer class
3           action provides restitution to the injured and deterrence to the wrongdoer; thus,
            the ends of equity and justice are attained.  Due to the numerous members of the
4           class and the existence of common questions of fact and law, a class action will
            serve the economies of time, effort, and expense and prevent possible inconsistent
5           results. Litigating . . . individual lawsuits . . . would be a waste of judicial
            resources, and addressing the common issues in one action would aid judicial
6           administration.[2]

7           Lennox Hearth Products, Inc., Lennox Industries Inc., and Lennox International, Inc.,

8    (collectively "Lennox") sold glass-front sealed fireplaces to tens of thousands of consumers when

9    Lennox knew, yet failed adequately to disclose that momentary contact with the unprotected 500

10   degree glass front would cause third degree burns and cannot be safely used without an adequate

11   barrier to guard against contact with the super-heated glass.  Lennox's knowing sale of dangerous

12   fireplaces poses an ongoing unreasonable danger to children and others.  Each individual Plaintiff

13   and class members' damages are relatively modest when compared to the substantial cost of

14   litigating a case of this nature.

15          The proposed Class consists of:

16          All consumers who are residents of the United States and who own homes
            or other residential dwellings in which one or more Superior or Lennox
17          brand single-pane sealed glass front fireplaces have been installed since
            February 6, 2004 and all consumers who are residents of California and
18          own homes or other residential dwellings in which one or more Superior
            brand single-pane glass sealed front fireplaces have been installed since
19          March 1, 2003.[3]

20          "Consumer" means an individual who bought his or her home or fireplace
            for personal, family, or household purposes.
21
            Excluded from the class are (1) the judge to whom this case is assigned
22
     _____

23
                [2] Clark v. TAP Pharm. Prods. Inc., 798 N.E.2d 123, 134 (Ill. App. Ct. 2003) (internal
24   citations omitted) (certifying nationwide class under Illinois law on claims under Illinois
     Consumer Fraud law and for unjust enrichment).

25              [3] For California residents with Superior brand fireplaces, the class period should begin on
26   March 1, 2003, because any statute of limitations was tolled by the filing of *Anissa Neslon-Fields
     and Jerry Fields v. Superior Fireplace Company, Lennox Hearth Products, Inc., Lennox
27   International, Inc., and Does 1 through 25, Inclusive*, Sacramento County Superior Court No.
     07AS00918.  The *Fields* case has been stayed pending the outcome of *Keilholtz*.  The *Fields* case
28   alleges claims concerning Superior brand fireplaces as plaintiffs were unaware of the Lennox
     brand when they filed the *Fields* case.

     _____

1   and any member of the judge's immediate family; and (2) anyone who
    suffered personal injury related to Defendants' fireplaces.
2

3   This class satisfies all of the class certification requirements mandated by Federal Rule of Civil

4   Procedure 23(a).  In addition, the Class meets the requirements of Rule 23(b)(3) as common

5   issues predominate, and as class treatment is superior to other methods of adjudication.  Indeed,

6   purporting to offer a common albeit inadequate remedy to the class in response to Plaintiffs'

7   CLRA notice, Lennox goes a long way toward acknowledging that certification is appropriate.[4]

8   **II.      COMMON OPERATIVE FACTS**

9          **A.      The Product**

10         Defendants have designed, manufactured and sold tens of thousands of single pane glass

11  front gas fireplaces ("hazardous fireplaces") under the Lennox and Superior brand name since

12  1998.[5]  The glass front reaches up to 500 degrees Fahrenheit during normal operation.[6]  Wolden

13  Decl., Ex. 2, 24:1-25:16; Ex. 3, 24:17-25; Ex. 4, 19:9-16; Ex. 5, 9:10-25, Ex. 6, 70:13-71:5.

14  Hazardous fireplaces are installed directly into and flush with the wall, inches above the floor, in

15  rooms which are readily accessible to infants and small children.[7]  Wolden Decl., Ex. 7.

16  Defendants' common design scheme over the class period fails to include any standard safety

17  feature to guard against or prevent contact with the super-heated glass.  Wolden Decl., Ex. 3,

18  40:3-6; Ex. 6, 98:9-14; Ex. 12, 57:13-23.

19         **B.      Lennox's California Operations**

20         Defendant Lennox Hearth Products, Inc. ("LHP") is a California corporation, operating

21  under the name LHP since approximately 2000, with its primary place of business in Orange

22

23  _____

24         [4] Lennox disclosed this offer to the Court in the most recent Joint Case Management
    Statement (Document 103 at 10:7-15).

25         [5] Defendants describe the hazardous fireplaces as an "appliance."  Wolden Decl., Ex. 1.

26         [6] Unless otherwise noted, temperatures are in degrees Fahrenheit.

27         [7] Temperatures of 158 degrees Fahrenheit and above, less than one second of contact with
    the glass surface can cause a severe third degree burn. Declaration of Carol Pollack-Nelson
28  [hereafter Pollack-Nelson Decl.], at 9:21-24.  Young children are more susceptible to severe burn
    injuries because their epidermis is much less developed.  Dimick Decl., ¶¶ 6-7.

County, California.[8]  Wolden Decl., Ex. 17.  The Lennox Defendants, by and through LHP, develop, design, test, evaluate, market, manufacture, draft installation and customer care manuals, engage in sales activities, and provide technical support and services for their hazardous fireplaces from California.  Wolden Decl., Ex. 3, 10:13-12:14, 22:4-17, Ex. 4, 18:2-6, Ex. 8, 17:21-18:2; Ex. 9, 7:1-25.  Everything preceding the actual fabrication and manufacture of fireplaces and accessories occurs in California.  Wolden Decl., Ex 11, 19:25-21:20.  In the last decade, 82% of the hazardous fireplaces sold under the Superior brand were manufactured in California.  Wolden Decl., Ex. ¶ 18.[9]

### C.    The Problem

#### 1.    500-Degree Glass Fronts:  Too Hot To Handle

Lennox's hazardous fireplaces are designed in such a manner that the exposed surface of the glass front will approach or exceed 500 degrees during normal operation.  Wolden Decl., Exs. 2-6.  Because American National Standards Institute ("ANSI") testing standard Z21-88 requires the temperature of the exposed glass to be recorded, the Lennox Defendants have known since before February of 1998 that the exposed glass of their hazardous fireplaces reaches temperatures up to 500 degrees during normal operation.  (Wolden Decl., Ex. 2, 24:13-25:22.)  This is confirmed by Lennox's internal pre-production testing goal of 475 degrees for the glass.  Wolden Decl., Ex. 2, 25:23-27:12.

#### 2.    Contradictory Industry Standards

Lennox cannot rely on the ANSI standard to justify the safety of its hazardous fireplaces, because that standard exposes consumers to third-degree burns.  Pollack-Nelson Decl., 4:25-7:2.  The ANSI standard requires that exposed surfaces, *excluding the glass*, must not exceed a maximum temperature of 117 degrees plus ambient room temperature during operation.  Wolden

---

[8] LHP's predecessor by merger, Superior Fireplace Company, was incorporated in California on May 11, 1977.  Wolden Decl., Ex. 14.

[9] Defendants have not provided Plaintiffs with figures for Lennox models.  Since Lennox models are simply fancier versions of the Superior models, it is reasonable to surmise that manufacturing percentages are consistent between the two.

Decl., Ex. 13, 74:1-75:14.  But, "[t]he ANSI Z21.88 standard exempts the glass fronts [which comprises the vast majority of the exposed surface area] from any temperature requirements as long as those temperatures do not exceed 500 degree F."  Wolden Decl., Ex. 13, 75:9-76:9; Pollack-Nelson Decl., 8:20-21.

Paul Tiegs, President of the laboratory which tests and certifies all Lennox and Superior brand fireplaces, admitted that the purpose of ANSI standard Z21.88 "is to mitigate potential burning of flesh."  Wolden Decl., Ex. 13, 75:21.  When asked to explain what the ANSI committee had done to mitigate the ability of the exempted glass to burn flesh, Tiegs responded: "This has been a topic of many [90%] ANSI meetings.  No one's come up with a good way to do that."  Wolden Decl., Ex. 13, 76:2-6.  Lennox is on the ANSI Z21.88 committee, and "[t]here's usually at least one [Lennox] representative at each meeting."  Wolden Decl., Ex. 13, 84:15-20.

### 3. Lennox's Hazardous Fireplaces are Dangerously Defective, And They Knew It

Due to the extreme temperatures reached by the glass fronts, Defendants' fireplaces present an unreasonable risk of injury under normal and foreseeable use conditions.  Pollack-Nelson Decl., 3:16-21.  Henriques and Moritz of Harvard Medical School published the gold standard of the relationship between time, surface temperature, and burn potential in human beings.  Pollack-Nelson Decl., 7:3-20; 9:25-10:19; 12:12-16.  Their work, relied on by scholars like Stoll and Wu, confirms that less than one second of contact is required with a surface temperature of 158 degrees and above to cause severe second and third degree burns.  Pollack-Nelson Decl., *Id.*  The glass fronts of Lennox's fireplaces thus reach temperatures more than 300 degrees in excess of that necessary to cause third degree burns in less than one second.  *Id.  See also* Dimick Decl., 3:14-19.

Numerous safety standards which responsibly consider the relationship between burn hazard and surface temperature in the home and elsewhere rely upon Henriques and Moritz.  For example, the ASTM Standard Guide for Heated System Surface Conditions that Produce Contact Burn Injuries (C1055-03), established in 1986, states that "at no time ... are conditions that produce third degree burns recommended."  Pollack-Nelson Decl., ¶ 8b, 6:26-7:2.  The UL

1    standard for Household Electric Ranges sets a maximum standard of 172 degrees. Carol Pollack-

2    Nelson Decl., 8:11-15. The British Standard "Safety of Machinery - Temperatures of Touchable

3    Surfaces" describes a burn threshold of 183.2 and 194 degrees at a contact time of .5 seconds.

4    Pollack-Nelson Decl., 8:17-23. The British standard for surface temperature, BS EN

5    13202:2000, applies a contact duration of at least 4 seconds for adults, but affords special

6    attention to children noting: "[u]ntil 24 months children do not have reflexes which are quick

7    enough to remove their hands from what burns them. They do not have the ability to get away

8    from hot surfaces therefore. The contact period can be up to 15 seconds for very young

9    children." Pollack-Nelson Decl., 8:24-9:14, 5:22-25, 7:19-8:5.

10        Numerous articles published in scholarly journals and elsewhere provide compelling

11    evidence of the emerging hazard caused by the increased prevalence of glass front gas fireplaces

12    in homes throughout the U.S. Pollack-Nelson Decl., 10:25-12:28, Dimick Decl., 4:13-5:12.

13    These publications noted a 15- fold increase in the incidence of pediatric palmar burns associated

14    with these fireplaces and described burns from contact with the glass front doors as the most

15    common pediatric burn. Pollack-Nelson Decl., 10:25-12:28, Dimick Decl., 4:13-5:12.

16        As a manufacturer, Lennox was obligated to apply this body of relevant information to

17    develop a reasonably safe consumer product, but recklessly failed to do so. Pollack-Nelson

18    Decl., 3:16-6:19. The unfortunate consequences of this failing caused a string of injuries to

19    children involving severe second and third degree burns. Pollack-Nelson Decl., 10:23-12:38;

20    13:10-14:27. Still, despite recognizing that their fireplaces can cause severe burns, Lennox

21    continues to defend its design and promote its safety. Pollack-Nelson Decl., 24:10-15.

22              **4.    Effective Guarding Was The Only Option**

23        Manufacturers must identify a feasible and effective solution to mitigate consumer risk

24    caused by their products.  Pollack-Nelson Decl., 21:3-22. Manufacturers should warn of a hazard

25    only if it cannot be: 1) designed out; or 2) mitigated by effective guarding. Pollack-Nelson Decl.,

26    17:8-18. Defendants' hazardous fireplaces were uniquely unqualified for warnings because the

27    fire poses an attractive nuisance to vulnerable children who lack the coordination and reflexes to

28    prevent accidental contact. Pollack-Nelson Decl., 4:13-14, 16:4-27, 17:1-2. Given the severity

of the harm, the parents' lack of knowledge of the super heated glass, and the inability of parents to protect children from all hazards in the modern home, effective passive guarding, as opposed to supervision, is the solution to defendants' Hazardous Fireplaces. Pollack-Nelson Decl., 20:22-24:27. Congress and the Consumer Product Safety Commission advocate and require effective guarding for hazards such as those posed by Lennox's hazardous fireplaces. Pollack-Nelson Decl., 22:17-4, 24:24-27. "Warnings and instructions should never have been relied upon to overcome poor product design, inconsistency with consumer motivations and behaviors, and hazards that are difficult to perceive, appreciate or control (CPSC, 2003). Therein lies the fatal flaw with this product." Pollack-Nelson Decl., 24:24-27.

### 5.    Average Consumers

In February 2006, Kirk and Kolleen Keilholtz purchased and moved into a new home in which a Superior Model SSDVT 4035 CNE, had been installed. Kirk and Kolleen were not aware that the glass surface temperature of their hazardous fireplace could reach 500 degrees during normal operation, or was capable of causing third degree burns from momentary contact. The Hazardous Fireplace had the fit and appearance of an appliance like an oven or microwave, appliances capable of generating heat, but not to the degree of causing third degree burns. The Hazardous Fireplace was installed inches above the ground, well within reach of their children without any guarding or visible warning. Their fireplace did not require reference to a manual to operate; you just flipped a switch on the wall.

The Keilholtz family used their Hazardous Fireplace occasionally until the winter of 2007, when Kolleen witnessed the family dog injure itself when came into contact with the glass front of the Hazardous Fireplace. Later, the Keilholtzes learned of a "warning" a few pages into the manual which advised generally about "hot" surfaces but failed to specify the glass as a hazard. Importantly, the Keilholtzes learned that the manual does not disclose the third degree burn potential or the 500 degree surface temperatures Lennox knows the glass will reach under normal operation. Even if this writing had communicated the degree of the hazardous fireplaces pose, *which it does not*, this information was received too late. The manual was haded over when they moved into their Oakley home, after the hazardous fireplace had been installed and paid for

1    as part of the purchase price.

2        The Keilholtz family has since ceased using their Hazardous Fireplace due to the extreme

3    burn danger it poses.  They would not have paid for this Hazardous Fireplace or even let it be

4    installed in their home had they known of its danger.  See Keilholtz Decs.

5        **6.        An Untenable Personal And Social Cost**

6        Experience in U.S. Burn Centers over the last decade bears compelling witness to the

7    severity of the problem caused by glass front gas fireplaces.  Pollack-Nelson Decl., 11:1-12:28;

8    Dimick Decl., 4:13-5:12; Wooldridge Decl.; Shaw Decl.  The Federal Consumer Protection

9    Safety Commission ("CPSC") estimates that between 1999 and early 2009, over 2000 children

10   between the ages of 0-5 presented with burns (mostly to the hands) at U.S. hospitals caused by

11   falling into, backing into or otherwise contacting a gas fireplace.  Pollack-Nelson Decl., 12:24-

12   25.[10]   The types of injuries caused by glass front fireplaces are severe, and require intensive

13   treatment.  Dimick Decl., 5:13-6:10.  Treatment costs associated with these types of burns may

14   range from $100,000.00 to $150,000.00, with the most severe cases resulting in treatment costs

15   of up to $300,000.00.  Dimick Decl., 8:10-15.

16       The personal cost of these injuries is best told by those who have experienced the trauma.

17   To that end, the Declarations of Deirdre Wooldridge and Ashley Shaw demonstrate the

18   importance of the relief sought by plaintiffs and the class.

19       **7.        Too Little Too Late**

20       On March 1, 2007, Plaintiffs in the *Fields* case sent Lennox a Civil Code section 1782

21   notice on behalf of California consumers.  This notice demanded that Lennox immediately recall

22   or adequately and effectively retrofit all hazardous fireplaces.  Lennox never responded to this

23   notice.  Under the direction of this Court's March 30, 2009, Order, plaintiffs sent Lennox a

24   second, analogous CLRA notice, this time on behalf of a national class of hazardous fireplace

25   owners.  By letter dated May 1, 2009, Lennox purported to make an offer of compliance to

26   _____

27       [10] A recent survey of burn centers suggests the CPSC estimate is low.  For example,
28   Regions Hospital Burn Center in St. Paul, Minnesota, alone estimates treating forty to sixty
     pediatric burns per year caused by contact with glass front gas fireplaces."  Dimick Decl., ¶ 11.

1  plaintiffs and to all Hazardous Fireplace owners in the United States.  While woefully inadequate

2  to address the problem,[11] Lennox's action in this regard acknowledges the presence of an

3  ascertainable class with claims sufficiently typical to offer a common, class-wide remedy.

4  **III.    ARGUMENT**

5           In determining whether to certify claims for classwide treatment, courts focus only on

6  whether the requirements of Rule 23 have been satisfied.  *Eisen v. Carlisle & Jacquelin*, 417 U.S.

7  156, 178 (1974).  Courts should not evaluate whether the plaintiffs will prevail on the merits.  *Id.*

8  at 178.  Instead, the Court should treat all substantive allegations of the complaint as true.

9  *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975), *cert. denied* 429 U.S. 816 (1976).  In

10 other words, when addressing a motion for class certification, the "focus . . . is on whether a

11 class action is an appropriate vehicle for litigat[ing] the claims alleged, and not on the merits of

12 the case."  *Dal Ponte v. American Mortg. Exp. Corp.*, 2006 U.S. Dist. LEXIS 57675 at *6 (D.N.J.

13 2006) (certifying nationwide class for New Jersey Consumer Protection Act and unjust

14 enrichment claims).  The court may make some limited inquiry into the substance of a case to

15 determine the satisfaction of the requirements of Rule 23, however, "it is improper to advance a

16 decision on the merits at the class certification stage."  *In re Abbott Labs.*, 2007 U.S. Dist LEXIS

17 44459 at *15 (N.D. Cal. 2007) (quoting *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480

18 (9th Cir. 1983)).

19          A trial court must conduct a "rigorous analysis" to determine whether these requirements

20 have been met.  "This does not mean, however, that the Court must rigorously analyze the merits

21 of the underlying class claims."  *Bates v. United Parcel Ser.*, 204 F.R.D. 440, 444 (N.D. Cal.

22 2001).  The central issue for consideration at this stage of litigation is the appropriateness of class

23 certification, not the probability of success on the merits.  *Xiufang Situ v. Leavitt*, 240 F.R.D. 551,

24 559 (N.D. Cal. 2007).  Ultimately, the Court has broad discretion to certify a class, and its

25

26

27          [11] The "screen panel" offered by Lennox failed under the only testing to which it had been
   subjected, generating heat that Lennox described as almost as hot as the glass.  Defendants
28 changed the name from "heat guard" to "screen panel" so as not to mislead consumers as to its
   temperature-reducing properties.  Wolden Decl., Ex. 20; Ex. 12, 99-106.

1    decision may be reversed only for abuse of discretion.

2        A.    The Elements of Rule 23(a) Are Satisfied Here.

3            1.    The Class is So Numerous that the Individual Joinder of All Class
                    Members Would Be Impracticable.
4
5        The Class that Plaintiffs seek to represent consists of tens of thousands of homeowners in

6    which one of Defendants' hazardous fireplaces has been installed since February 6, 2004 (and

7    back to March 1, 2003, for Superior brand fireplaces in California).  This class is ascertainable

8    and so numerous that joinder of all members would be impracticable.  Fed. R. Civ. P. 23 (a)(1).

9            2.    There Are Questions of Law and Fact Common to Plaintiffs and
                    Members of the Class.

10        Next, Rule 23(a)(2) requires that common questions of law or fact exist among class

11   members.  The requirements for finding commonality are minimal.  *Xiufang Situ*, 240 F.R.D. at

12   560; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also* 1 Newberg on

13   Class Actions § 3.10, 274-278 (4th ed. 2002) ("Rule 23(a)(2)) is easily met in most cases. When

14   the party opposing the class has engaged in some conduct that affects a group of persons and

15   gives rise to a cause of action, one or more elements of that cause of action will be common to all

16   persons affected.").  Accordingly, it is sufficient that Plaintiffs show the "existence of shared

17   legal issues with divergent factual predicates" or "a common core of salient facts coupled with

18   disparate legal remedies within the class."  *Hanlon,* 150 F.3d at 1019.  Here the claims of

19   Plaintiffs and the class members all arise from the same legal theories—that Defendants' sale of

20   hazardous fireplaces violates the CLRA, the UCL, and unjustly enriched them.  The following

21   questions of fact and law are common, namely, whether:

22            a.    Lennox fireplaces are unreasonably dangerous to consumers, posing risk

23   during foreseeable use of third degree burns;

24            b.    Lennox knew that its fireplaces pose a foreseeable unreasonable risk of

25   third degree burns;

26            c.    Lennox had a duty to Plaintiffs and the class to fully disclose the risk of

27   third degree burns;

28            d.    Lennox had exclusive knowledge of material facts regarding its fireplaces

1    not known to the Plaintiffs and the class;

2            e.      Lennox failed to fully disclose all material facts regarding the hazard

3    posed to Plaintiffs and the Class by the super-heated glass of its fireplaces;

4            f.       a reasonable consumer would find the undisclosed facts material;

5            g.      Defendants' conduct was "unfair" under the UCL;

6            h.      Defendants were unjustly enriched;

7            i.       Plaintiffs and Class members have been damaged by Defendants' conduct;

8            j.       Plaintiffs and Class members are entitled to restitution;

9            k.      Plaintiffs and Class members are entitled to an injunction; and

10            l.       California law applies to all the class members.

11   These questions form the basis of Plaintiffs' and Class members' consumer protection claims,

12   and are sufficient to establish commonality.

13          **3.**      **The Claims of the Representative Plaintiffs are Typical of the Claims of the Class.**

14

15       Rule 23(a)(3), which requires that the named plaintiffs be members of the class and

16   possess claims that are "reasonably co-extensive with those of the absent class members," is also

17   interpreted permissively. *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other

18   members have the same or similar injury, whether the action is based on conduct which is not

19   unique to the named plaintiffs and whether other class members have been injured by the same

20   conduct." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (internal citations

21   omitted).

22       As in *Chamberlan v. Ford Motor Co*., where the Court found typicality of a class of

23   automobile owners seeking recovery for damages caused by Ford's knowing sale of defective

24   manifolds, Plaintiffs and members of the proposed class "all have claims arising from the [same]

25   fraudulent scheme." 223 F.R.D. 524, 526 (N.D. Cal. 2004). Specifically, Defendants' knowing

26   sale of dangerous fireplaces with unguarded 500 degree glass fronts that put children at risk of

27   third degree burns caused Plaintiffs and all members of the proposed Class to suffer the same

28   type of injury – paying for fireplaces that are unreasonably dangerous. Plaintiffs, like all class

members, seek recovery for these damages.  Accordingly, the typicality requirement is satisfied.

**4.      The Class Representatives and Their Counsel Will Fairly and Adequately Protect the Interests of the Class.**

Finally, Rule 23(a)(4) has two requirements: (1) that the named plaintiffs and their counsel do not have conflicts of interest with the proposed class; and (2) that the named plaintiffs and their counsel can prosecute the action vigorously through qualified counsel.  *Hanlon*, 150 F.3d at 1020.  Both prongs of the adequacy test are satisfied here.

First, as shown above, Plaintiffs' interests are squarely aligned with the interests of absent class members as all those involved have purchased Defendants' fireplaces or homes with Defendants' fireplaces and have consequently suffered the same damages.  Plaintiffs' claims, which seek to remedy these wrongs under California's consumer protection laws, are typical of those of the proposed Class.  There is no conflict of interest among Plaintiffs and the Class members since all share the same goal of establishing liability of Lennox for failing to fully disclose all material information regarding its fireplaces.

Second, there can be no dispute that Mr. and Mrs. Keilholtz  and their counsel have prosecuted this action vigorously since learning of Defendants' unlawful conduct and will continue to do so.  The Keilholtzes have demonstrated their commitment to serve as Class Representative in this litigation. They have provided information used in the complaints, allowed their fireplace to be tested, gathered documents and responded to written discovery requests, reviewed correspondence concerning the case, and communicated regularly with counsel (Kirk Keilholtz Decl., ¶ 3).

Finally, all three firms representing the Plaintiffs and the Class -- Clayeo C. Arnold, Cory Watson Crowder & DeGaris, and Ram & Olson -- have extensive experience in successfully prosecuting complex cases including consumer class actions.  (Wolden Decl., 2-4; Tapley Decl., ¶¶ 3-10; Ram  Decl., ¶¶ 2, 3. and Ex. A.)

**B.**     **The Rule 23(b)(3) Elements are Satisfied as Common Questions Predominate and Certification Presents the Superior Method for Adjudication.**

     **1.**     **California Law Applies to the Class.**

          **a.**     **Applying California Law to the Nationwide Class is Constitutional.**

In determining whether California law may be applied to the claims of nonresident class members, the Court must initially consider whether it is constitutional to do so.  California may do so if it has a "significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [the forum's] law is not arbitrary or unfair.'"  *Phillips Petroleum, Co. v. Shutts*, 472 U.S. 797, 821-22 (1995).

Courts in California have certified nationwide classes under California law particularly where, as here, the defendant had significant contacts with the state.  For example, in *Church v. Cons. Freightways, Inc*., 1992 U.S. Dist. LEXIS 18234 at *16 (N.D. Cal. 1992), the court held that the defendants' contacts and interests were sufficient to meet the *Shutts* standard and thus applying California law to class members outside of California was consistent with due process.  Many of the defendants in *Church* either resided or conducted business in California and some of the alleged misrepresentations emanated from California.  *Id.*  Additionally, the Court held, California has an interest in addressing the alleged fraudulent conduct of its residents.  *Id.*  The court therefore found that application of California law to a nationwide class was constitutional even though a large percentage of class members did not reside in California.  *Id.*

In *Clothesrigger, Inc. v. GTE Corp*., 191 Cal. App. 3d 605, 612-13 (1987)*,* the court engaged in a similar analysis to find that California law could constitutionally be applied to a nationwide class asserting claims of fraud, unfair business practices, and negligent misrepresentation.  *Clothesrigger, Inc.*, 191 Cal. App. 3d at 613.  *Clothesrigger* was an action brought against long distance telephone communications companies by subscribers who alleged they were wrongfully charged for certain unanswered long distance calls without disclosure.  *Id.* at 609.  There, the court found a sufficient aggregation of contacts based on evidence that (1) defendants did business in California; (2) one defendant had its principal office in California; (3)

1   a significant number of class members resided in California; and (4) the agents of one defendant

2   who prepared the promotional and advertising literature at issue did so in California.  *Id.* at 613.

3          Analogizing the facts before it to those in *Clothesrigger*, the court held in *Wershba v.*

4   *Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242 (2001) that there were significant contacts with

5   California by the defendant to satisfy constitutional concerns and support certification of a

6   nationwide class. Plaintiffs alleged that Apple violated the CLRA and UCL when it discontinued

7   its practice of providing free telephone technical support.  *Id.* at 231.  There, as in *Clothesrigger*,

8   the defendant's principal place of business was in California and a substantial number of the class

9   members were located in California.  *Id.* at 242.  The brochures promising free technical support

10  were prepared in and distributed from California.  *Id.*  Importantly, the core decision at issue, the

11  policy to discontinue free technical support, was made at defendant's headquarters in California.

12  *Id.*  Also similar to *Clothesrigger*, even though transactions may have occurred outside

13  California, the representations upon which the causes of action rested necessarily emanated from

14  California.  *Id.* at 243.

15         More recently, the court in *Parkinson v. Hyundai Motor America*, 2008 U.S. Dist LEXIS

16  101098 at *47-49 (C.D. Cal. 2008) held that California law may constitutionally apply to a

17  nationwide class with consumer products claims under the CLRA and UCL where the

18  defendant's relevant operations, as here, occurred in California.[12]

19         Thus, where the requisite contacts exist with a particular state, courts do not hesitate to

20  apply that state's law to a nationwide class.

21         Similarly, this class action involves a significant degree of contacts between the Class

22  claims and the state of California, thereby making the application of California's consumer

23  _____

24         [12] Courts in other jurisdictions have also granted class certification to nationwide

25  consumer classes under one uniform body of law.  *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 75  (D.N.J. 2009) (certifying claims national class for New Jersey

26  Consumer Fraud Act and unjust enrichment claims); *Cuesta v. Ford Motor Co.,* 209 P. 3d 278 (Okla. 2009) (certifying nationwide class of truck owners for defective accelerator pedals);

27  *Mooney v. Allianz Life Ins. Co.*, 244 F.R.D. 531 (D. Minn. 2007) (certifying national class of purchasers of annuity products under Minnesota Prevention of Consumer Fraud Act); *Dal Ponte*

28  *v. American Mortg. Exp. Corp.*, 2006 U.S. Dist. LEXIS 57675 at *6 (D.N.J. 2006) (certifying nationwide class for New Jersey Consumer Protection Act and unjust enrichment claims).

1   protection laws constitutional.  Lennox has significant contacts with the state of California such

2   that application of its consumer protection laws, the Unfair Competition Law ("UCL") and the

3   Consumers Legal Remedies Act ("CLRA"), is not arbitrary or unfair.  Through wholly owned

4   subsidiary Lennox Hearth Products, Inc. ("LHP"), a California corporation since 1977,

5   Defendants develop, design, test, evaluate, market, manufacture, author and produce installation

6   and customer manuals, and provide technical support and services for their hazardous fireplaces.

7   Additionally, a large number of Class members reside in California.  California thus has a great

8   interest in protecting its citizens from its unlawful conduct and ensuring that a company

9   headquartered within and operationally directed from California complies with its laws.

10              **b.      Governmental Interests Dictate Applying California Law.**

11          Once it is shown that the requisite constitutional standards have been met, California law

12   automatically applies to the nationwide class unless the defendant opposing nationwide

13   certification meets its "substantial burden" of showing that a foreign law, rather than California

14   law, should apply.  *Martin v. Dahlberg,* 156 F.R.D. 207, 218 (N.D. Cal. 1994); *Church v. Cons.*

15   *Freightways, Inc*., 1992 U.S.Dist. LEXIS 18234 at *12 (N.D. Cal. 1992) ("this Court generally

16   presumes that California law will apply unless defendants demonstrate conclusively that the laws

17   of the other states will apply").  Indeed, "[i]n order to avoid [this] automatic application of

18   California law to a nationwide class, defendants have the 'substantial burden' of demonstrating

19   (1) whether a true conflict exists among the laws of the various states; (2) whether each state has

20   an interest in applying its own law; and (3) if each state has an interest, which state interest will

21   be most impaired if its law is not applied.  *Martin*, 156 F.R.D. at 218.  This three step

22   "governmental interest analysis" is used in California[13] to ascertain the most appropriate law to

23   apply when there is no effective choice-of-law agreement.  Although at this time Defendants

24   have not attempted to invoke the laws of a state other than California, Plaintiffs maintain that

25   even if they were to do so, California law will certainly apply under the state's choice of law

26   rules.

27   _____

28          [13] In diversity cases such as this one, federal courts apply the choice-of-law rules of the
     forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941).

1

**(1)     No conflict exists among consumer protection laws.**

2       First, no "true conflict" exists among the consumer protection laws of the various states.

3   "Under the first step of the governmental interest approach, the foreign law proponent must

4   identify the applicable rule of law in each potentially concerned state and must show it materially

5   differs from the law of California." *Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906,

6   919 (2001).  Regardless of what foreign state's law Lennox might put forward, as explained by

7   the Ninth Circuit in *Hanlon*, "idiosyncratic differences between state consumer protection laws

8   are not sufficiently substantive to predominate over the shared claims."  150 F.3d 1022-23; *see*

9   *also Wershba*, 91 Cal. App. 4 at 244 ("Even though there may be differences in consumer

10   protection laws from state to state, this is not necessarily fatal to a finding that there is a

11   predominance of common issues among a nationwide class."); *In re Abbott Labs.*, 2007 U.S. Dist

12   LEXIS 44459 at *26 (N.D. Cal. 2007) (variations in some states' unjust enrichment laws did not

13   prevent nationwide class certification).  "In looking at claims for unjust enrichment, we must

14   keep in mind that the very nature of such claims requires a focus on the gains of the defendants,

15   not the losses of the plaintiffs. That is a universal thread throughout all common law causes of

16   action for unjust enrichment."  *In re Abbott Labs* 2007 U.S. Dist LEXIS 44459 at *27 (citation

17   omitted).

18       As noted above, the differences among the consumer protection laws of the 50 states are

19   "idiosyncratic" at best.  The irrelevance of any distinction is further substantiated by the fact that

20   all consumer protection laws seek to achieve the same goal of outlawing deceptive business

21   practices.  Similarly, the law of unjust enrichment does not materially vary from state to state and

22   thus courts have certified national classes for unjust enrichment.  See e.g. In re Abbott Labs 2007

23   U.S. Dist LEXIS 44459 at *27 ("The 'idiosyncratic differences' between state unjust enrichment

24   laws  'are not sufficiently substantive to predominate over the shared claims'") (citation omitted);

25   *Clark v. TAP Pharm. Prods. Inc*., 798 N.E.2d 123 (Ill. App. Ct. 2003) (certifying nationwide

26   class under Illinois law for Illinois Consumer Fraud and unjust enrichment claims); *Dal Ponte v.*

27   *American Mortg. Exp. Corp.*, 2006 U.S. Dist. LEXIS 57675 at *6 (D.N.J. 2006) (certifying

28   nationwide class for New Jersey Consumer Protection Act and unjust enrichment claims).

1

**(2)  No other state has an interest in applying its own law.**

2      Even if the consumer protection and unjust enrichment laws of the various states were

3   materially different, the Court may properly find California law applicable if Lennox is unable to

4   establish that another state has a greater interest in applying its laws to the claims of Plaintiffs

5   and the Class.  *Washington Mut.*, 24 Cal. 4th at 920.  As discussed above, California has an

6   important interest in punishing Lennox and preventing fraud by corporations residing and

7   conducting business in the state. *Church v. Cons. Freightways, Inc.*, 1992 U.S.Dist LEXIS 18234

8   at *16 (N.D. Cal. 1992).  Moreover, Defendants' sale of the hazardous fireplaces is inextricably

9   tied to and a direct result of Defendants' substantial California operations.  In addition,

10  "California's more favorable laws may properly apply to benefit nonresident plaintiffs when their

11  home states have no identifiable interest in denying such persons full recovery."  *Clothesrigger*,

12  191 Cal. App. 3d at 616.

13

**(3)  California's interests in deterring unlawful conduct
would be most impaired if its laws were not applied.**

14

15      Finally, foreign law is not applicable here regardless of a true conflict of laws and the

16  interests of other states because Lennox cannot demonstrate that such interests outweigh those of

17  California.  While the individual states in which class members reside may also presumably be

18  interested in protecting the rights of their citizens, California stands to suffer the greatest

19  impairment if these claims are not litigated under its laws.  Again, California, the situs of

20  Defendants' unlawful conduct, is uniquely interested in punishing Lennox, deterring similar

21  activity, and protecting its consumers, which comprise a large portion of the Class.  *See e.g., In re*

22  *Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 20 (N.D. Cal. 1986) (noting that "each jurisdiction

23  would rather have the injuries of its citizens litigated and compensated under another state's laws

24  than not litigated or compensated at all," and finding that "defendants cannot show that any

25  jurisdiction has a greater interest in applying its own law than in assuring the maintenance of a

26  class action.").

27

28

## 2.    Common Issues of Law and Fact Predominate.

The predominance inquiry concerns whether a proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem,* 521 U.S. at 623. As the United States Supreme Court emphasized, "predominance is a test readily met in certain cases alleging consumer . . . fraud." *Amchem*, 521 U.S. at 625. Common issues "predominate" where a common nucleus of facts and potential legal remedies dominate the litigation. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005). Furthermore, the existence of individual issues will not, by itself, defeat certification. *See Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985). Rather, they must be less significant than the common issues and must not be so unmanageable as to outweigh the benefits of class treatment. *Dal Ponte v. American Mortg. Exp. Corp.*, 2006 U.S. Dist. LEXIS 57675 at 22 (D.N.J. 2006). As all class members' claims arise out of the same set of operative facts and are premised on identical legal theories, the predominance requirement is satisfied here. Common questions predominate in this case, where each class member will seek to remedy the same grievance: Lennox's knowing sale of hazardous fireplaces and failure fully and adequately to disclose all material information regarding the risk of third degree burns posed by the unguarded 500 degree glass front.

The CLRA makes it unlawful to use "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to a consumer. Cal. Civ. Code §1770(a). Such unlawful conduct includes "representing that goods or services have…characteristics…uses, benefits, or qualities which they do not have,"[14] and "representing that goods or services are of a particular standard, quality, or grade…if they are of another."[15] Similarly, the UCL prohibits "unfair competition," defined broadly as "any unlawful, unfair, or fraudulent business act or practice and unfair, untrue or misleading advertising." Cal. Bus. & Prof. Code §17200. Defendants' knowing sale of dangerous fireplaces and failure fully to inform Plaintiffs and Class that the 500 degree glass fronts pose a substantial risk of third degree burns

---

[14] Cal. Civ. Code §1770(a)(5).

[15] Cal. Civ. Code §1770(a)(7).

1   to children, seniors, and consumers generally constitutes unfair and deceptive business practices

2   under both statues.

3        "[T]he causation required by Civil Code section 1780 does not make plaintiffs' [CLRA]

4   claims unsuitable for class treatment."  *Parkinson v. Hyundai Motor Am.*, 2008 U.S. Dist. LEXIS

5   101098  *40 (C.D. Cal. 2008) citing *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th

6   1282, 1292 (2002).  Likewise, causation issues need not defeat class treatment of UCL claims.  *In*

7   *re Tobacco II Cases*, 46 Cal. 4th 298 (2009).  In an omissions case, the issue of causation is

8   framed in terms of materiality.  *Chamberlan v. Ford Motor Co*., 369 F. Supp. 2d 1138, 1144-45

9   (N.D. Cal. 2005).  Materiality is "judged by the effect on a reasonable consumer." Id.  at 1145.

10  *See also Parkinson v. Hyundai Motor Am.*, 2008 U.S. Dist. LEXIS 101098, *40 (citation omitted)

11  (If materiality is shown, reliance and causation may be presumed as to the entire class.); *In re*

12  *Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (quotation omitted) (For UCL claims, "a

13  presumption, or at least an inference, of reliance arises wherever there is a showing that a

14  misrepresentation was material").  A misrepresentation is judged to be material if a reasonable

15  man would attach importance to its existence or nonexistence.  Thus, causation, as measured by

16  materiality, can readily be established on a class-wide basis and therefore does not create

17  individual issues.

18       Numerous courts have indeed found that common issues predominate in similar

19  circumstances.  *See e.g.*, *Chamberlan,* 402 F.3d at 962 (declining review of class certification

20  where defendant knowingly sold cars with defective intake manifolds); *Parkinson*, 2008 U.S.

21  Dist. LEXIS 101098 at *41-43 (common questions under the UCL and CLRA – whether

22  defendant was aware of the defect and had a duty to disclose its knowledge, and whether the

23  failure to disclose would be material to a reasonable consumer – predominate).[16] Finally, any

_____

25       [16] *See also In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 72-75 (D.N.J.
    2009) (common questions predominated under the New Jersey Consume Fraud Act and common
26  law of unjust enrichment where defendant was allegedly aware that the Tele Aid system in its
    cars would stop working after 2007); *Daffin v. Ford Motor Co*., 458 F.3d 549, 551 (6th Cir.
27  2006) (predominant common issues included whether vehicle throttle body assembly was
    defective and whether defect reduced value of vehicle); *S. States Police Benevolent Ass'n v. First*
28  *Choice Armor & Equip., Inc*., 241 F.R.D. 85, 89 (D. Mass. 2007) (finding predominance and
    certifying class where all of the class members bought and/or used defendant's allegedly

_____

1  inquiries related to the amount of damages to which Plaintiffs and the Class members are entitled

2  do not overwhelm the numerous common questions identified above.  Indeed, it has been held

3  time and again that "[t]he individuation of damages in consumer class actions is rarely

4  determinative under Rule 23(b)(3)." *Negrete v. Allianz Life Ins. Co of N.A.*, 238 F.R.D. 482, 494

5  (C.D. Cal. 2006) (citation omitted).  "The amount of damages is invariably an individual question

6  and does not defeat class action treatment." *Blackie v. Barrack*, 524 F.2d at 905.  As long as

7  common issues as to liability exist and predominate, individual damages considerations do not

8  defeat predominance.  *Moyle v. County of Contra Costa*, 2007 U.S. Dist. LEXIS 89509 *70-71

9  (N.D. Cal. 2007); *In re Rubber Chems. Anti. Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) ("that

10  the damages calculation may involve individualized analysis is not by itself sufficient to preclude

11  certification when liability can be determined on a class-wide basis.").

12        Here, Plaintiffs seek disgorgement under the CLRA and UCL of Lennox's revenues or

13  profits from its wrongful conduct, including restitution to the Plaintiffs and members of the class.

14  "[S]uch relief plainly does not turn upon individualized issues."  *In re Cipro Cases I and II*, No.

15  4154, 4220, 2003 WL 23005275, at *6 fn. 1 (Cal. Super. Nov. 23, 2003), *aff'd as modified*, 121

16  Cal. App. 4th 402 (Cal. Ct. App. 2004).  Because restitution under the CLRA and UCL focuses

17  on defendant's unjust enrichment rather than compensation for actual loss, the issue of the

18  amount of recovery would be common to all Class members.

19        **3.    Class Treatment is Superior to Other Methods of Adjudication.**

20        Finally, Rule 23(b)(3) requires Plaintiffs to demonstrate that the proposed class action is

21  superior to all other available forms of adjudication.  In determining superiority, four

22  considerations are relevant: (1) the interest that members of the class have in individually

23  controlling the prosecution of separate actions; (2) the extent and nature of any litigation  already

24  commenced by members of the class; (3) the desirability of concentrating the litigation in the

25  particular forum; and (4) the difficulties likely encountered in the management of a class action.

26

27  _____

28  defective bullet-proof vests); *Zeno v. Ford Motor Co.*, 238 F.R.D. 173, 197 (W.D. Pa. 2006)
(finding predominance and certifying class where defendant allegedly did not provide purchasers
of Ford F-150 trucks with upgraded radiators with towing and cooling options).

1    Fed. R. Civ. P. 23(b)(3); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-93 (9th Cir.

2    2001).

3           As to the first factor, Class members have little interest in controlling this action on their

4    own as the damages affecting each individual would not justify the cost of litigating a case of this

5    complexity.  Class actions, as a general proposition, are favored for the very purpose of providing

6    individuals with relatively modest damages, and therefore little incentive to litigate, an

7    opportunity to prosecute their rights.  The Supreme Court crystallized this notion in Amchem

8    explaining that "[t]he policy at the very core of the class action mechanism is to overcome the

9    problem that small recoveries do not provide the incentive for any individual to bring a solo

10   action prosecuting his or her rights." 521 U.S. at 617.  *See also Zinser*, 253 F.3d at 1190 ("Where

11   damages suffered by each putative class member are not large, this factor weighs in favor of

12   certifying a class action."); see also Wright, Miller & Kane, Federal Practice and Procedure

13   §1779 at 557 (2d ed. 1986) ("For example, a group composed of consumers or small investors

14   typically will be unable to pursue their claims on an individual basis because the cost of doing so

15   exceeds any recovery they might secure.  When this is the case it seems appropriate to conclude

16   that the class action is superior to other available methods for the fair and efficient adjudication

17   of the controversy.").   Here, Class members have suffered a moderate amount of damages and

18   are therefore unlikely to pursue litigation against Lennox on their own.

19          Next, other than personal injury cases, Plaintiffs and their counsel are unaware of any

20   other existing litigation in the United States brought by or against any Class Member concerning

21   Lennox's defective fireplaces.  This class action is for economic injury and an injunction.

22   Accordingly, the second factor is not at issue here.

23          Third, it is desirable for the Class members to concentrate the present litigation in this

24   forum.  As noted earlier, a significant number of Class members reside in California; Defendants'

25   operating company's principal place of business is in California; and the alleged misconduct

26   giving rise to the claims of Plaintiffs and the Class emanates directly from Defendants'

27   substantial activities in California.  Thus, it is impracticable for any other state or forum to

28   resolve these matters.

Finally, there is no insurmountable obstacle associated with managing this class action. Plaintiffs and the Class, who have suffered identical harm caused by Defendants' conduct, seek certification as to Lennox's knowing sale of dangerous fireplaces and its failure adequately to inform purchasers of the full extent of the unacceptable risk posed by the unguarded 500 degree glass front. Just as the nationwide nature of this Class does not defeat the predominance of common issues, it also does not render this case unmanageable. Rather, the uniform application of California's consumer protection law, which is substantially similar to the consumer protection laws of the other 49 states, permits the litigation to proceed without overwhelming legal issues, while best protecting the interests of all Class members. *See In re Pizza Time*, 112 F.R.D. at 20-21 (certifying a nationwide class, which satisfied due process and choice of law considerations, under California law).

Here, class certification is preferable for a variety of reasons that benefit both the litigants as well as the Court. Among other things, class actions such as this protect defendants from the expense and unpredictability of multiple, inconsistent adjudications; provide the court system with a mechanism for disposing of multiple common claims without the administrative burden of multiple lawsuits; and enfranchise aggrieved persons with similar claims, especially those too small to warrant the expense of individual litigation. This Court, too, has recognized the value of class certification in cases like the present where the alternative to certification would either be "numerous individual suits or the abandonment of individual claims," of which the former "would undoubtedly result in great duplication of effort given the predominance of common questions of law and fact, while the latter would result in lost access to the courts." *Tierno*, 2006 U.S. Dist. LEXIS 71794 at *36 (N.D.Cal.2006).

Finally, in the Third Joint Case Management Conference Statement, filed May 7, 2009 Lennox disclosed its May 1, 2009 letter response to Plaintiffs' CLRA demand. In that letter, Defendants implicitly admit the appropriateness of class certification, by treating class members "who had had a fireplace installed in their home since February 6, 2004," as a class with respect to Lennox's proposed, yet drastically insufficient, class-wide remedy. (See Document 103 at 10:7-15).

1

**CONCLUSION**

2    For the foregoing reasons, Plaintiffs respectfully request that the Court certify the

3 proposed Class.

4                 Respectfully submitted,

5 DATED:  August 28, 2009       RAM & OLSON LLP

6

7               By:    ___*/s/ Michael F. Ram*___

8                  Michael F. Ram (SBN 104805)
                  mram@ramolson.com

9                  RAM & OLSON LLP
                  555 Montgomery Street, Suite 820

10                San Francisco, CA  94111
                Telephone:   (415) 433-4949

11                Facsimile:  (415) 433-7311

12                *Attorneys for Plaintiffs and the Class*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28